Patricia LEARY, Plaintiff,

v.

HOBET MINING, INC.,
et al., Defendants.

Civil Action No. 2:96–0913.

United States District Court,
S.D. West Virginia,
Charleston Division.

Oct. 23, 1997.

---

David L. Grubb, Charleston, WV, for Plaintiff.

Roger A. Wolfe, Erin Magee Condaras, Jackson & Kelly, Charleston, WV, for Defendants.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

Pending is Defendants' motion for summary judgment, originally filed May 27, 1997 and renewed by supplemental memorandum filed September 5, 1997. Also pending is Plaintiff's motion to strike, which the Court **DENIES**[1], and Plaintiff's motion to file surreply to Defendants' reply brief, which the Court **GRANTS**. For reasons that follow, the Court **GRANTS** in part and **DENIES** in part Defendants' motion for summary judgment.

### I. FACTUAL BACKGROUND

In evaluating a summary judgment motion, the Court must construe the facts in the light most favorable to Plaintiff.

Mrs. Leary began her employment as a draftsman with Sharples Coal Company's Engineering Department in November 1986. For her first year, Jeff Hoops was Mrs. Leary's supervisor; subsequently, John McDaniel was her supervisor. In 1992, Ashland Coal, Inc. acquired Sharples and merged it with Hobet Mining, Inc., another Ashland Coal, Inc., business. Subsequently, Mrs. Leary became an employee of Hobet.

Throughout her tenure, she unsuccessfully sought training in other areas, particularly in working with permits and in surveying. At times, in response to Mrs. Leary's request for more training or for a computer at her desk, McDaniel told her, "the squeaky wheel gets replaced." McDaniel Depo. at 87. Moreover, he once informed her the West Virginia Department of Environmental Protection would rather "deal with guys," Pl.'s Answers to Def.'s Interr. at 6, and, on another occasion, told her she could sit in his lap at a meeting where all the seats were taken, Leary Depo. at 127. Also, Mrs. Leary asked to attend a company–sponsored trip to a college football game, but her request was not entertained seriously. Her supervisor at the time, Jeff Hoops, told her, "Why would you want to go on a bus trip with a bunch of drunken men?" Leary Depo. at 51.

In 1995 Mrs. Leary became pregnant, due to deliver a child in March 1996. When she gave notice of her upcoming maternity leave, McDaniel asked her twice whether she would be returning from the leave. When she answered in the affirmative, he "looked [her] straight in the eye and said, 'Good,' both times." Leary Depo. at 45.

In the last months of 1995, after losing or having modified several important contracts, Hobet began a cost reduction program. As a part of that, John McDaniel formulated cost-saving measures within his department. He evaluated the anticipated future workloads, the positions needed to perform that work, and the persons who were best suited for those positions. This led to a preliminary list of employees who might be terminated as part of a reduction in force. Mrs. Leary was on that list, as were several others.[2]

In this determination, McDaniel used neither seniority nor evaluations as a determining factor. Employees less senior than Mrs. Leary were retained. Mrs. Leary's file contains no written evaluations, much less poor ones. In fact, McDaniel told Mrs. Leary

1. Although the Court appreciates Plaintiff's valiant efforts to enforce the September 5 deadline, the Court believes Defendants renewed their motion for summary judgment in substance, if not in form, by filing a supplemental memorandum within the deadline.

Therefore, the Court also **DENIES** as moot Defendants' motion to file for summary judgment out of time.

2. The parties dispute each other's use of statistical evidence on the percentage of female employees who were terminated as part of the reduction–in–force.

"the fact that he didn't criticize or he let us alone was an indication that we were doing good. So except for one or two mistakes, that's about all he ever said to me about it." Leary Depo. at 56. McDaniel concedes Mrs. Leary was qualified to do her job and probably qualified to perform some of the remaining jobs in the department. McDaniel Depo. at 49–50.

In late 1995 Ashland Coal began developing a corporate cost–reduction effort, called Leadership Through Competitiveness ("LTC"). Hobet management decided to wait until Ashland Coal was ready to implement LTC, and then "do all the terminations in the same time frame." Kenneth Woodring Depo. at 21.

On January 11, 1996 Mrs. Leary sought and received a leave of absence pursuant to the Family and Medical Leave Act ("FMLA").

On or about February 19, 1996 Ashland Coal distributed a memorandum to Hobet supervisors as a worksheet for determining which employees to terminate in the reduction in force. The memorandum stated, "It is critical that all managers adhere to these procedures to ensure that all termination decisions are carried out in a fair and defensible manner." Pl.'s Initial Mem., Ex. G at Bates 112. As described above, McDaniel had created his own process for determining who to terminate. McDaniel Depo. at 32 ("I just basically did it. I didn't use a set form.") McDaniel recalled receiving the Ashland memorandum but did not use it or any other worksheet. Id. at 33–34. Instead, he "just penciled ... work notes," although such work notes "would have had similar information on it" as the Ashland Coal memorandum. Id.

Mrs. Leary's child was born on February 29, 1996 while she was on FMLA leave. On March 8, 1996 Homer Toler, a Hobet employee, contacted Mrs. Leary to explain she had been terminated. Shortly thereafter, Mrs. Leary was re–hospitalized with double pneumonia.

After Mrs. Leary was terminated, Mike Stowers was transferred in from another department; he possessed additional skill and experience to act not only as a draftsman, but also as a surveyor.

Mrs. Leary filed this civil action against Hobet Mining, Ashland Coal, and Homer Toler, Jr. in the Circuit Court of Boone County, West Virginia. Mrs. Leary seeks recovery under, *inter alia*, the FMLA, 29 U.S.C. § 2601 *et seq.*, and the West Virginia Human Rights Act, *W. Va.Code* § 5–11–1, *et seq.*[3] The Defendants removed to this Court on September 24, 1996.

## II. DISCUSSION

### A. *Summary Judgment Standard*

Our Court of Appeals often has stated the settled standard and shifting burdens governing the disposition of a motion for summary judgment:

To prevail on a motion for summary judgment, the [movant] must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) it is entitled to judgment as a matter of law. In determining whether a genuine issue of material fact has been raised, we must construe all inferences in favor of the [the nonmovant]. If, however, "the evidence is so one–sided that one party must prevail as a matter of law," we must affirm the grant of summary judgment in that party's favor. The [nonmovant] "cannot create a genuine issue of fact through mere speculation or the building of one inference upon another." To survive [the motion], the [nonmovant] may not rest on [his] pleadings, but must demonstrate that specific, material facts exist that give rise to a genuine issue. As the Anderson Court explained, the "mere existence of a scintilla of evidence in support of the [non–movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non–movant.]"

---

**3.** In her initial responsive memorandum, Mrs. Leary conceded Defendants were entitled to summary judgment for the wrongful discharge claim and the tort of outrage claim. The Court, therefore, **GRANTS** summary judgment to Defendants on those two claims. Moreover, Mrs. Leary agreed to the dismissal of her claim against Homer Toler, Jr. under the West Virginia Human Rights Act. Accordingly, the Court **DISMISSES** the West Virginia Human Rights Act claim against Homer Toler, Jr.

*Harleysville Mut. Ins. Co. v. Packer,* 60 F.3d 1116, 1119–20 (4th Cir.1995) (citations omitted); *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.), *cert. denied,* 513 U.S. 813, 814, 115 S.Ct. 67, 68, 130 L.Ed.2d 24 (1994); *see also Cabro Foods, Inc. v. Wells Fargo Armored Service Corp.,* 962 F.Supp. 75, 77 (S.D.W.Va. 1997); *Spradling v. Blackburn,* 919 F.Supp. 969, 974 (S.D.W.Va.1996).

"At bottom, the district court must determine whether the party opposing the motion for summary judgment has presented genuinely disputed facts which remain to be tried. If not, the district court may resolve the legal questions between the parties as a matter of law and enter judgment accordingly." *Thompson Everett, Inc. v. National Cable Advertising, L.P.,* 57 F.3d 1317, 1323 (4th Cir.1995).

### B. Family and Medical Leave Act

Mrs. Leary claims Hobet and Ashland Coal violated the FMLA by failing to restore her to the same position of employment she held at the beginning of her FMLA leave.

The FMLA requires a covered employer to allow an eligible employee up to twelve workweeks of family or medical leave during any twelve–month period. 29 U.S.C. § 2612(a). Once the FMLA leave is completed, the employer must restore the employee "to the position of employment held by the employee when the leave commenced" or to an equivalent position. *Id.* §§ 2614(a)(1)(A), (B). The employer is not required, however, to provide to the employee "any right, benefit, or position of employment other than the right, benefit, or position to which the employee would have been entitled had the employee never taken leave." *Id.* § 2614(a)(3)(B). In other words,

> [a]n employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period. An employer must be able to show that an employee would not otherwise have been employed

at the time reinstatement is requested in order to deny restoration to employment.

29 C.F.R. § 825.216(a).

█ The Fourth Circuit has not yet announced the test to be used in FMLA retaliatory discharge claims. The District Court of South Carolina has addressed the issue. It followed several other courts when it applied the test used in Title VII retaliatory discharge cases. *Dodgens v. Kent Manufacturing Co.,* 955 F.Supp. 560, 566 (D.S.C.1997). This Court also is convinced to apply the *Dodgens* analysis. Accordingly, to make a prima facie case, Mrs. Leary must make a showing that "1) the employee engaged in protected activity; 2) the employer took adverse employment action against the employee; and 3) a causal connection existed between the protected activity and the adverse action." *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir.1985), abrogated on other grounds, *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)(Title VII retaliatory discharge). If the proponent makes a prima facie case, the burden shifts to Defendants to articulate a legitimate reason for their decision. *Id.* Once that is produced, the burden reshifts to Plaintiff to show the proffered reasons were pretextual, *id.,* and that Defendant chose instead to terminate Plaintiff because she had exercised her FMLA rights.

Here, Mrs. Leary clearly satisfies the first two elements because she took FMLA leave and she was terminated; the dispute focuses on whether she satisfies the third element. Mrs. Leary's arguments fail to demonstrate a causal connection. First, there is no evidence Hobet had a pattern of discriminating against people who took FMLA leave. *See Dodgens,* 955 F.Supp. at 566 (finding no causal connection when facts show no pattern of discrimination). Instead, at least thirty-one other Hobet employees have taken FMLA leave since 1993. Ex. 7, Def.'s Supp. Mem. Three,[4] including Mrs. Leary, later were discharged or laid off. These statistics do not demonstrate a pattern of discriminat-

**4.** One more employee who took FMLA leave was discharged for terminating a "Last Chance Agreement." Ex. 7, Def.'s Supp. Mem.

**456**

ing against individuals exercising their FMLA rights.

Second, Mrs. Leary has proffered no direct evidence of a causal connection between her FMLA leave and her termination. In fact, the few statements Mrs. Leary's supervisors made regarding her FMLA leave demonstrated they anticipated her return. See Leary Depo. at 45 ("John asked me twice if I was planning on coming back to work after having the baby, and I told him definitely, because I had bills to pay. He said good. He looked me straight in the eye and said, 'Good,' both times.").

Mrs. Leary's best argument is based on the timing of the decision—that the decision to terminate her was made while she was on FMLA leave. Some courts have held that a close temporal connection between the employee's protected activity and the termination decision is sufficient to satisfy a causal connection. *See, e.g., McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 796–97 (7th Cir. 1997) ("A close temporal connection between the two events 'is generally enough to satisfy the third element of the prima facie test.'") (quoting *Rabinovitz v. Pena*, 89 F.3d 482, 489 (7th Cir.1996))(Title VII retaliatory discharge). The Fourth Circuit has approved this test in retaliatory discharge cases, although not yet in the context of FMLA-retaliatory discharge cases.[5] See *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir.1994) (finding that temporal proximity satisfied a prima facie case in an age, race, and retaliatory discrimination claim). Under the *Carter* test, Mrs. Leary satisfies the causal connection prong. In *Carter* there was a four-month gap between the protected activity and the termination. Mrs. Leary took her leave on January 11. It appears the final decision was made in February, perhaps late February.[6] Even if the final decision was not made until just prior to the company's communicating the decision to Mrs. Leary, the gap would be less than *Carter's* four months. Accordingly, we assume without de-

ciding the temporal proximity between Mrs. Leary's leave and her termination satisfies the causal connection prong and, therefore, her prima facie case.

■ Hobet has proffered evidence explaining how the termination decision was reached. McDaniel, first, projected anticipated future contracts and, second, extrapolated what positions would be needed to fill those contracts. Next, he filled each position with the person who would best perform that job. Individuals who were not slated into those positions were then slated for termination. Mrs. Leary was one of those. Making termination decisions based on a business's future needs and the skills, experience and expertise of the workforce is a legitimate, nondiscriminatory reason. *See Duke v. Uniroyal, Inc.*, 928 F.2d 1413, 1418–19 (4th Cir.), *cert. denied*, 502 U.S. 963, 112 S.Ct. 429, 116 L.Ed.2d 449 (1991)(acknowledging the legitimacy of discharging plaintiffs because "they were the least qualified for the existing and future needs of Uniroyal"); *Page v. Bolger*, 645 F.2d 227, 230 (4th Cir.), *cert. denied*, 454 U.S. 892, 102 S.Ct. 388, 70 L.Ed.2d 206 (1981)(accepting as legitimate a business's weighing its future needs and the relative qualifications of each employee, even though such weighing necessarily involved some subjective factors).

■ Accordingly, the burden shifts back to the plaintiff to demonstrate the employer's reason is pretextual. "To make this demonstration, the employee must show that as between [the discriminatory reason] and the defendant's explanation, [the discriminatory reason] was the more likely reason for the dismissal, or that the employer's proffered explanation is simply 'unworthy of credence.'" *Burns v. AAF–McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir.1996), *cert. denied*, ——— U.S. ———, 117 S.Ct. 1247, 137 L.Ed.2d 329 (1997)(age discrimination). Here, Mrs. Leary notes McDaniel did not follow specific guidelines he was given for determining

---

**5.** Given the relative dearth of FMLA-retaliatory discrimination cases, the Court finds it necessary and appropriate to draw from established Fourth Circuit authority in discrimination cases involving other types of claims.

**6.** The parties dispute, even internally, when the final decision to terminate Mrs. Leary was made. In the end, this is irrelevant because the Court finds Mrs. Leary cannot demonstrate Hobet's proffered reason was pretextual.

which employees to terminate. Given that, she argues her interpretation of why McDaniel slated her for termination (discrimination because she exercised her FMLA rights) is as plausible as Defendants'. She argues, therefore, the case should go to a jury. Mrs. Leary has not, however, produced any evidence to rebut Hobet's proffered reason. *See id.* at 732 ("[I]f the plaintiff offers nothing to disprove the defendant's nondiscriminatory explanations, the explanations' weakness alone is insufficient to create an issue of pretext. Instead, the burden of production returns to the plaintiff to present affirmative evidence of [defendants' discriminatory motives].") Because she cannot satisfy her burden of demonstrating Defendants' reason is pretextual, a reasonable jury could not find in her favor. Accordingly, the Court **GRANTS** summary judgment to Defendants on this claim.

### C. West Virginia Human Rights Act and Ashland Coal as a Defendant

Given the evidence before it on (1) the West Virginia Human Rights Act claim and (2) the propriety of Ashland as a Defendant, the Court determines there are genuine issues of material fact extant. Accordingly, the Court **DENIES** summary judgment to Defendants as to these matters.

### III. CONCLUSION

Based upon the foregoing, the Court (1) **GRANTS** summary judgment to Defendants and eliminates the FMLA claim, and (2) **DENIES** summary judgment to Defendants on both the West Virginia Human Rights Act claim and Ashland's proposed dismissal as a party. Furthermore, the Court **DENIES** Plaintiff's motion to strike Defendants' memorandum and **GRANTS** Plaintiff's motion to file a surreply to Defendants' reply memorandum. Finally, the Court **DENIES** as moot Defendants' motion to file out of time.