**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 04-1022

MARC W. WEBSTER,

Plaintiff - Appellant,

versus

HANSFORD T. JOHNSON, Acting Secretary of the
Navy,

Defendant - Appellee.

Appeal from the United States District Court for the Eastern
District of Virginia, at Alexandria. James C. Cacheris, Senior
District Judge. (CA-03-327-A)

Argued: December 3, 2004          Decided: February 18, 2005

Before WIDENER and WILKINSON, Circuit Judges, and Norman K. MOON,
United States District Judge for the Western District of Virginia,
sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Aaron David Frishberg, New York, New York, for Appellant.
Dennis Edward Szybala, Assistant United States Attorney, OFFICE OF
THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON
BRIEF:** Paul J. McNulty, United States Attorney, Sara S. Brown, Law
Student, Alexandria, Virginia; Scott Garner, OFFICE OF COUNSEL FOR
THE MILITARY SEALIFT COMMAND, Virginia Beach, Virginia, for
Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

Marc Webster was a Second Officer aboard the USNS PECOS, an oiler operated by civilian mariners. The oiler supports U.S. Navy ships. Webster is African American, and he served under a white First Officer, who in turn served under a white Captain. Webster unsuccessfully applied for promotion to First Officer in 1999. He alleges racial discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (2000). More specifically, he alleges that his failure to be promoted was the product of a racially hostile environment which in turn produced performance evaluations motivated by racial animus. Second, he alleges that the Promotion Board itself was racially biased. For the reasons that follow, we affirm the district court's rejection of these claims.

I.

Included in the Navy Department's Military Sealift Command ("MSC"), whose vessels support combatant Navy ships worldwide, are some 35 civilian auxiliary ships. The ship relevant to this case, the PECOS, was an oiler in the MSC. In ships like the PECOS, the "deck department" handles both cargo operations and navigation. Under the First Officer of that department are two Second Officers -- one for cargo and one for navigation -- and two third mates. Appellant Marc Webster, an African American, has served in

3

the MSC since starting as a seaman in 1980.  He served aboard the PECOS as Second Officer in charge of cargo in 1998 and 1999.

According to Webster, his service on the PECOS was compromised by the hostility directed at him by First Officer Keller, a Caucasian.  Webster claims that he had "never been treated with such disrespect."  Webster lists a number of events to demonstrate the racially hostile work environment created by Keller.  For instance, Keller found Webster "deficient for not filling out reports monthly, which were made on a quarterly basis under the last First Officer."  Keller criticized Webster for "leaving keys to the gun locker in an unsecured area," even though that was the place that "an authorized person would know where to locate them if necessary."  Keller wrote up Webster as AWOL even though Webster had called with an excuse -- that he was rained in at the San Francisco airport -- and promised to catch the next standby flight.

Especially relevant to this case, Keller wrote two promotion performance evaluations that Webster found unfair.  The first came in November 1998. Keller rated Webster excellent in 5 areas, good in 4, and adequate in 3.  He also wrote the following comment:

> Mr. Webster is an effective Officer who performs his duties satisfactory.  His significant weakness are that on least two occasions he failed to carry out the Masters orders in a timely manner, tends to acts very independently without keeping his supervisor informed.

Capt. Watson then revised these ratings downward, and wrote:

> Mr. Webster was presented this eval a month ago and has refused to sign.  He does not respond well to changing

4

circumstances and conditions. Mr. Webster is spending at least 2 hr a week in my office receiving guidance.

The Navy observes that Webster's numerical evaluations are comparable to those he received on other ships before boarding the PECOS. The Navy also produced written comments, similar to those quoted above, from Webster's superiors on other ships.

Keller acknowledged that after receiving criticism, Webster's performance did improve. Keller even noted that in August 2002, when Webster relieved him for 30 days as First Officer, he found everything in perfect order upon returning and that Webster "did a real good job." In his December 1998 evaluation, Keller recognized improvement in Webster's performance. In one area he ranked Webster as outstanding, in three as excellent, in five as good, and in three as adequate. He wrote:

> Mr. Webster is an effective Officer who performs his duty satisfactory. Notable weakness are that he continues his failure to communicate with his immediate supervisor . . . .

Capt. Watson again downgraded this -- two "excellents," seven "goods," and three "adequates." He wrote:

> Mr. Webster frequently focuses his energy and time in the wrong place. He was given this evaluation but failed to sign it or return it prior to his departure from the vessel. He needs to decide if he wants to be a "Seaman" or something else then move in that direction only.

Webster transferred from the PECOS on January 3, 1999.

Webster said that he went to the captain complaining of the negative comments in the two promotion evaluations. The captain

5

allegedly responded that if Webster did not sign the evaluations and the captain did not forward them, Webster could "forget about them." Webster claims to have understood this to mean that the evaluations would not become a part of his record. Based on this understanding, Webster believed that he did not need to pursue any further his attempt to rectify the critical remarks set forth by Keller in the evaluations. Thus, Webster did not utilize the Equal Employment Opportunity ("EEO") process.

Webster first learned that the Promotion Evaluations had been placed in his file in April 1999, when the First Officer Promotion Board met. Webster alleges that there was no correlation between the candidates' scores on their performance evaluations and the Board's ratings. He alleges that Board members colluded to promote only those whom they wanted, without regard to qualification, by naming them "best qualified." The bases for the decisions that were made, he alleges, were merely pretextual.

The Navy, by contrast, emphasizes that the categories of evaluation were clearly announced beforehand. Webster scored 61 out of a maximum 120; he was ranked 20th out of 26 candidates. The top twelve were ranked "best qualified," eligible for immediate promotion. The lowest score among them was 91. The remaining applicants were ranked "qualified," eligible for temporary but not permanent promotion as the need arose. The Navy also shows that Webster had the lowest average of performance evaluations, yet was

6

still ranked 20th rather than 26th. Members of the Board later testified in depositions that Webster performed well on deck, but was weak in the administrative components of the job. One noted that "Chief Mate's a very -- it's an administratively heavy position . . . ."

When, in late April 1999, he learned that the negative evaluations had been placed in his file, Webster spoke to the Afloat Personnel Management Center ("APMC") employee preparing his promotion package to become a First Officer. He was directed to the Merit Systems Promotion Board, and from there to the EEO Office. The EEO official, Ms. Wilson, acknowledged his complaint about the biased evaluations. She says that she investigated the denial of a "best qualified" rating. On the other hand, she noted that Webster had "not clearly defined [the] bases" of his allegations, so she requested that he clarify the complaint. Webster never responded to this request. However, the Navy EEO office dismissed the charges on the grounds that they had not been brought in a timely fashion. He appealed the dismissal to the EEOC on June 1, 2001. On March 6, 2002, the EEOC affirmed the agency's dismissal of Webster's complaint. This was not Webster's first experience with the EEO system. In 1985, he had filed an EEO complaint based on his service in another vessel.

Webster filed his federal claims in the U.S. District Court for the District of Columbia in October 2002; in March 2003, they

7

were transferred to the Eastern District of Virginia. Webster sought expungement of the evaluations and a permanent promotion.

In November 2003, the district court granted the Navy's motion for summary judgment on all claims. Webster appealed. We review grants of summary judgment under a de novo standard of review, Higgins v. E.I. Dupont de Nemours & Co., 863 F.2d 1162, 1167 (4th Cir. 1988), and we now affirm on all points.

## II.

Webster first argues that he presented a colorable claim of a racially-motivated hostile work environment that should have been tried to a jury. Because Capt. Watson misled him into believing that the promotion evaluations by Keller would not go into his personnel file, he argues that the Navy is estopped from asserting that the initial EEO charge was untimely. Assuming his claim can proceed, Webster believes he has made a sufficient showing of a racially hostile work environment to reach a jury.

## A.

Webster's administrative remedies were not timely initiated, and his claim is therefore barred. The district court noted that Title VII requires a federal employee to exhaust administrative remedies before coming to federal court. 42 U.S.C. § 2000e-16(c) (2000); 29 C.F.R. § 1614.407 (2004). The employee must contact an

8

EEO counselor with his complaint within 45 days of the alleged discriminatory event.  29 C.F.R. §§ 1614.105(a)(1) (2004).

Webster received the allegedly improper evaluations in November and December 1998, but did not contact the EEO counselor until late April 1999 -- some 120 days afterward rather than the required 45.  The claim was therefore untimely.  Webster argued that, because Capt. Watson allegedly told him that he could "forget about" the evaluations, the limitations period should be seen to run from April 1999, when Webster saw that the evaluations were part of his record.  Failing that, the limitations period should be equitably tolled.  We agree with the district court that the 45-day period began upon receipt of the evaluations, and that equitable tolling is not available here.

To avoid contravening the 45-day rule, Webster argues that  he discovered the inclusion of the evaluations in his file only in April 1999, and so the 45 days should begin then.  The limitations period begins to run from "the effective date" of the allegedly discriminatory personnel action.  Jakubiak v. Perry, 101 F.3d 23, 26-27 (4th Cir. 1996).  Here, that was when the evaluations were issued.  Arguing that it should instead run from Webster's discovery of them in his record is nothing more than a request that equity toll the limitations period because Webster was misled.

Equitable tolling is not available here.  The district court stressed that Webster had previously filed an EEO complaint (in

9

1985) and was therefore familiar with how the process worked and what it demanded of claimants. Webster, in other words, cannot claim that he did not understand how to pursue his rights, much less that extraordinary circumstance prevented his doing so.

Nor can Webster complain that his superiors tricked him into sleeping on his rights. Capt. Watson had no reason to suspect that Webster considered himself a victim of racial discrimination. The district court noted that Webster's only complaint to the captain was that Keller's evaluations were "unfair, negative, and inaccurate," not that they were discriminatory. A superior can hardly intend to delay a complaint that he has no reason to believe even exists. Under such circumstances, no equitable relief is forthcoming. See Zografov v. V.A. Med. Ctr., 779 F.2d 967, 970 (4th Cir. 1985) (when claimant does not explain to supervisor that he is raising a discrimination complaint, equitable tolling not available if supervisor recommends a course of action other than initiating the EEO process).

Rules for bringing claims are specific for good reason -- most importantly to bring prompt resolution to both parties to a claim. We are not authorized to suspend those rules absent efforts by the adverse party to undermine them. English v. Pabst Brewing Co., 828 F.2d 1047, 1049 (4th Cir. 1987). If we invoked equitable tolling for Webster, with his evident knowledge and experience in protecting his rights, we could hardly apply the rules to others.

Such consequences would, of course, fatally undermine the rules, and erode their utility in ensuring efficient claims resolution.

### B.

We note also that Webster presents no evidence of a racially hostile work environment. Keller may well have been a strict supervisor, but the evidence does not demonstrate any racial animus. It may be that he literally ran a tighter ship than previous First Officers, and it is possible that Webster's experiences on other ships led him to expect a more flexible approach to regulations. But this is not enough to suggest racial motivation. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998) ("Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'disciminat[ion] . . . because of . . . [race].'"). We cannot jump from the mere existence of criticism to the conclusion that the criticism was racially motivated.

Indeed, Capt. Watson -- whom Webster has identified as an honest broker -- consistently reduced the scores that Keller assigned to Webster, basing that reduction on his own observation. Moreover, the evidence shows that when Webster responded to Keller's high expectations, Keller rewarded him with praise and better evaluations. These interactions cannot justify an inference

11

that his criticisms were pretextual and aimed at Webster because of his race.

### III.

As to the Promotion Board's decision, we similarly agree with the district court. Webster alleges that his failure to be named among the "best qualified" stemmed from racial discrimination against him by the Board. The district court concluded that Webster established a prima facie case of discriminatory refusal to promote, see McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Carter v. Ball, 33 F.3d 450, 458-59 (4th Cir. 1994), because those who were given the "best qualified" rating were white. But it also found a "legitimate, nondiscriminatory reason" for the challenged action, Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981), sufficient to rebut the prima facie case. See Dugan v. Albemarle County Sch. Bd., 293 F.3d 716, 721 (4th Cir. 2002). That reason was that Webster's score in the Board's review process was substantially lower than that necessary to be rated as "best qualified."

The district court found that Webster failed to offer, in response to the rebuttal of his prima facie case, any "evidence from which a reasonable juror could conclude that the Board's decision was mere pretext" for unlawful discrimination. Indeed, the very basis on which Webster asserts that the Board was

12

arbitrary and discriminatory works to his detriment. Webster created an "average of averages by ranking" all candidates before the Board. But Webster's score, under his own method, was the lowest of all 26 candidates. The district court correctly observed that the Board's rankings cannot therefore establish an inference of discrimination because, in ranking him higher than last, they aided rather than prejudiced him. Lacking any evidence of racial discrimination, Webster's claim must fail.

IV.

The judgment of the district court is in all respects

AFFIRMED.

13