### Lillian C. YOUNG, Plaintiff

v.

### SHORE HEALTH SYSTEM, INC., Defendant

### No. CIV. AMD 02–2694.

United States District Court,
D. Maryland.

May 29, 2003.

Mindy G Farber, Mary Ellen Henry, Farber Taylor LLC, Rockville, MD, for Plaintiff.

Traci Burch, Bruce S Harrison, Shawe and Rosenthal LLP, Baltimore, MD, for Defendant.

## MEMORANDUM

DAVIS, District Judge.

The plaintiff, Lillian C. Young, brought this employment discrimination case against defendant, Shore Health System, Inc. ("SHS"), in state court, relying on disparate treatment and retaliation theories under Title VII of the Civil Rights Act of 1964("Title VII"), 42 U.S.C. § 2000e, *et seq.;* the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.;* and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.* ("ADA"); and state law. Defendant timely removed the case from the Circuit Court for Talbot County. Young's state-

law claims have been dismissed. Now pending is the defendant's motion for summary judgment. The issues have been fully briefed and no hearing is necessary. For the reasons stated herein, I shall grant the defendant's motion as to the Title VII and ADA claims. However, drawing all inferences in favor of Young, the non-movant, I shall deny the motion as to the ADEA claim (and the related retaliation claim) because it cannot be said as a matter of law that the circumstances of this case foreclose a reasonable finding of pretext. Nevertheless, as a matter of law, the sole "adverse employment action" for which Young may seek redress is her brief *indefinite suspension;* summary judgment shall be granted in favor of defendant as to Young's principal claim for *constructive discharge.*

## I.

Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Id.* at 248, 106 S.Ct. 2505. Summary judgment is also appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505. "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505; *Shealy v. Winston,* 929 F.2d 1009, 1012 (4th Cir.1991). Of course, the facts, as well as the justifiable inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmoving party. *See Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court, however, cannot rely upon unsupported speculation and it has an affirmative obligation to prevent factually unsupported claims and defenses from proceeding to trial. *See Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987).

## II.

Viewing the facts in the light most favorable to Young, the nonmovant, the following constitutes a summary of the facts underlying this case. The gravamen of all of Young's claims is straightforward: when, in August 2001, as a result of undisputed (and potentially grave) deficiencies in Young's work performance as a cytotechnologist, her employer imposed an indefinite suspension without pay, Young made a reasonable decision to resign from her employment because the circumstances surrounding her suspension amounted to a "constructive discharge." According to Young's expansive approach to the case, the "circumstances surround-

ing her resignation" cover the entirety of her four year employment tenure.

SHS operates Memorial Hospital ("Memorial") as a full service medical facility in Easton, Maryland. As part of its services, Memorial runs a pathology laboratory ("the Laboratory"), which employs technical staff and administrative staff. The Laboratory staff includes cytotechnologists, who are highly-trained specialists in the field of cytology. Cytotechnologists review slides of pap smears and report their findings. If a cytologist finds an abnormal cell, the slide is examined by a pathologist. Various types of cell abnormalities exist, ranging from mild to full-blown cancers. A mild abnormality is referred to as "low grade" and a serious abnormality as "high grade." Failure to note properly a high grade abnormality may have significant consequences, including the possibility of a missed cancer diagnosis.

Chesapeake Pathology Associates ("Chesapeake"), an independent contractor, actually operates the Laboratory. Chesapeake performs all anatomic and clinical pathology services that pathologists typically provide. Dr. Reinhardt Sahmel is employed by Chesapeake and serves as the Medical Director of the Laboratory. Although Dr. Sahmel does not supervise any of the laboratory's employees, he interviewed prospective cytotechnologists and provided hiring and firing recommendations to the Director of the Laboratory, John Nevins.

Young began working at Memorial as a cytotechnologist in June 1997; she was then 59 years-old and had well over 20 years of experience in the profession. Young interviewed for the position with Dr. Sahmel. During the interview, Young informed Dr. Sahmel she was a breast cancer survivor. Dr. Sahmel also knew of Young's other medical conditions, including

diabetes and joint problems as a result of arthritis. (During her employment, Young contracted Legionnaire's disease.)

Within a short period of time after she started working at Memorial, Young and her immediate supervisor, Terry Taylor, developed a palpable reciprocal antipathy. Taylor, who is only a few years younger than Young, maintained what the record seems to describe as a "punk rock" lifestyle; she dressed in tight spandex garments, and she sported a nose ring, spiked hair, body piercings, and tattoos. Young claims Taylor acted in a very demeaning and hostile manner towards her, often not speaking to her, and would also not respond when Young spoke to her. On a daily basis, Taylor would hum and chant incessantly next to Young's work station and speak to Young (if at all) in a demeaning and belittling manner. Although Young would openly discuss the possibility of retirement, Taylor would independently question Young as to when she would retire and would suggest that she should do so. As a Christmas present in 2000, Taylor gave Young what is described as "the death Tarot card," which Young found repugnant; Young also received a gift from Taylor of what she described as "a Mardi Gras ... death mask." In addition, Taylor would openly talk of "getting rid" of Young to co-workers.

According to Young, Taylor continually suggested to Young that she should retire. She also regularly told the staff that she thought Young should retire. Taylor complained constantly about Young's numerous medical appointments. Young attempted on several occasions to discuss her complaints about Taylor with Dr. Sahmel, but he refused to talk about the problem. At some time prior to Young's suspension, although there were no vacancies among the cytotechnologists, Taylor interviewed Kasteen Farmer, a 36 year-old fe-

male, for such a position. After Young's resignation, Taylor hired Farmer to fill that vacancy.

On deposition, Young also described negative treatment she received from Dr. Sahmel. At some point during her employment, Young informed Dr. Sahmel of her interest in perhaps changing careers. Specifically, Young applied for a stem cell research job in Philadelphia. Dr. Sahmel told Young she was too old to switch careers and that no one would hire her. On another occasion, when Young told Dr. Sahmel she was sick, he replied that she was being a "typical woman" and all that she needed was estrogen.

In 1998, Memorial implemented the "thin prep" technology, a new technique for pap smears enabling easier evaluation under the microscope. To practice the thin prep process, cytotechnologists are required to be certified. One of the companies providing certification training was located in Foxboro, Massachusetts. A cytotechnologist certified in Foxboro could return to his or her respective laboratory to certify other cytotechnologists. To train its staff for thin preps, SHS sent most of its cytotechnologists to Foxboro for three days of training. Because she is diabetic, and in view of the length of the trip, Young could not travel with the rest of the group at the end of a workday and, as a result, did not travel to Massachusetts. Subsequently, Dr. Sahmel certified Young.

The State of Maryland requires that cytotechnologists take annual proficiency tests. To pass, a cytotechnologist must examine 9 of 10 slides correctly. The rules provide that if a cytotechnologist does not pass the exam, he or she may continue to perform his or her duties, until a repeat exam is offered (usually within a month). If the cytotechnologist fails the second test, that individual may not practice again until he or she undergoes remedial training and passes a retest. Young received 100% proficiency on her examinations for 2000 and 2001. In the past five years, although there have been other cytotechnologists in the Laboratory who have failed the proficiency test, no one has failed the exam more than once. Accordingly, these cytotechnologists continued to work despite their failing grade.

Pursuant to the 1988 amendments to the Clinical Laboratory Improvement Act, 42 U.S.C. § 263a, at least ten percent of the slides that a cytotechnologist screens as negative or normal must be rescreened. Rescreening is generally performed by the cytotechnologist supervisor or pathologist. During Young's tenure at Memorial, although no policy existed providing for the suspension of a cytotechnologist for misreading slides, Memorial's cytology policy and procedure manual did provide for the review of a cytotechnologist's work by the medical director (Dr. Sahmel) to determine the cause of a problem if a cytotechnologist's total error rate on all false negatives was more than 50% of the acceptable error rate. If a worker had an error ratio more than 200% of the Laboratory average, then the offending cytotechnologist would be required to undergo remedial training. In an article published by Memorial in March 2003, a cytotechnologist reported that error rates ranged from 5% up to 20%.

As mentioned above, Young had many years of experience as a cytotechnologist reviewing pap smears prior to accepting her employment at Memorial Hospital. She had never experienced difficulties with her work quality. At Memorial, Young generally received excellent evaluations despite what Young describes as Taylor's attempts to provide poor performance reviews. (In 1999, Dr. Sahmel approved a mild form of discipline ("counseling") proposed by Taylor to address deficiencies in

the quality of Young's work.) Generally, Young's error rates always came near or below the Laboratory average. Indeed, just weeks before Young's indefinite suspension in August 2001, a proficiency review of the Laboratory staff resulted in a finding that Young was the only person in the Laboratory, including Dr. Sahmel and Terry Taylor, her supervisor, who reviewed 100 percent of her slides correctly.

Never having complained to a human resources department in her entire career, in April 2001, Young went to the Memorial Human Resources Department to complain about Taylor's conduct. Young spoke to the Director of Human Resources about Taylor's constant harassment (e.g., the chanting and humming next to Young's work area and Taylor's constant inquiries about when she was going to retire). Young testified in discovery that she was very nervous because Taylor kept asking her to retire, because someone had been brought in for an interview when there was no position available, and because she "knew" Taylor wanted to get rid of her. Young also produced a newspaper article about age discrimination. Young received no satisfactory response as a result of her complaints; Taylor denied that there were any serious problems between herself and Young.

Sometime after Young complained about Taylor in the spring of 2001, Taylor directed Young to screen all the high grade cases. Young was on a flex work schedule and normally arrived at work early, but she did not seek out this assignment. The high grade cases needed to be done early in the day to permit the results of the slide reviews to be matched, and submitted contemporaneously with, biopsies from the same patient. Not long after Young began to screen the high risks cases, in July 2001, Young reported three false negative reviews of high grade thin prep pap

smears in the same week. After discovering Young's errors, Nevins held a meeting with Young in his office; Dr. Sahmel and Taylor attended the meeting. After being informed of the mistakes, Young provided no explanation of why or how she might have committed the errors. As a result of the three high grade misses, SHS was obligated to rescreen Young's recent work product.

Nevins informed Young that in consequence of her three serious errors, she was suspended indefinitely without pay. Young was to call the Laboratory in about five days for further information, i.e., as to the progress of the review, but Nevins did not tell Young how long it might take to complete the review. Nevins told Young that if the rescreening revealed any additional false negatives among the high grades, Young would be terminated. In response, Young asked Nevins what he recommended she should do. Nevins responded that he could not tell her what to do. Young, in turn, stated, "I think I want to resign right now." Thereafter, Young and Nevins signed the Employee Warning Record regarding the incident and confirmed Young's resignation. In fact, however, upon the review of Young's work, no further deficiencies of consequence were discovered.

Young felt she had no choice but to resign. In making this decision, Young considered several factors, including: (1) her expectation (given her belief that Taylor was determined to replace her) that additional serious errors would most likely be found; (2) she had been told if other errors were found she would be discharged; (3) the fact that a discharge would make her re-employment as a cytotechnologist very difficult; (4) at the age of 63, a new career would have been impossible; (5) it could take months for Memorial Hospital to review her slides; and (6) her

fear that, as a result, she would lose her medical insurance for an indefinite period of time, or even permanently.

## III.

The legal standards to be applied to Young's disparate treatment claims, on the one hand, and her retaliation claims, on the other hand, are, respectively, the same, whether such claims arise under Title VII, the ADEA, or the ADA. *See generally Settle v. Baltimore County*, 34 F.Supp.2d 969, 990–93 (D.Md.1999), *aff'd without op.*, 203 F.3d 822 (4th Cir.2000). In order to prevail on any of her theories, Young must show that, but for defendant's discriminatory (or retaliatory) motive, she would not have suffered "an employment injury." *Id.* at 989. It has been long-settled that the judicially created proof scheme established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), applies to both disparate treatment claims as well as retaliation claims. Under the *McDonnell Douglas* paradigm, the plaintiff bears the burden to establish initially a prima facie case of discrimination (or retaliation). *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). In order to make out a prima facie case here (essentially, a "disparate discipline" case), Young must show that: (1) she is a member of a protected group, (2) she engaged in misconduct, or provided a deficient performance, comparable to that of others outside her protected group; (3) she suffered an adverse employment action; and (4) circumstances exist which show that she was disciplined and/or otherwise treated more harshly than similarly situated employees outside her protected group. *Cf. Settle*, 34 F.Supp.2d at 991–92. Further:

> Once the plaintiff establishes a prima facie case, a presumption of discrimination arises and the burden of production

is placed on the employer to articulate a legitimate nondiscriminatory reason for the adverse employment decision. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (*citing Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). Because the employer's burden is one of production and not of persuasion, it "is not required to prove absence of a discriminatory motive, but merely articulate some legitimate reason for its action." *E.E.O.C v. Clay Printing Co.*, 955 F.2d 936, 941 (4th Cir.1992) (internal quotation marks omitted) (*quoting E.E.O.C. v. Western Electric Co., Inc.*, 713 F.2d 1011, 1014 (4th Cir.1983)). If the employer meets this burden, the presumption of discrimination is eliminated, and the plaintiff bears the ultimate burden of proving by a preponderance of the evidence that the employer's nondiscriminatory reasons are pretextual and that the adverse employment action was actually taken because of the employee's race or sex. *Hicks*, 509 U.S. at 511, 113 S.Ct. 2742.

*Nichols v. Harford County Bd. of Educ.*, 189 F.Supp.2d 325, 340–41 (D.Md.2002).

The Supreme Court clarified the plaintiff's burden at the pretext stage in *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The Court reiterated that evidence of pretext, combined with the plaintiff's prima facie case, does not compel judgment for the plaintiff, because "it is not enough ... to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination." *Reeves*, 530 U.S. at 147, 120 S.Ct. 2097 (*quoting Hicks*, 509 U.S. at 519, 113 S.Ct. 2742). However, *Reeves* made plain that, under the appropriate circumstances, "a plaintiff's prima facie case, combined

with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.; see also Dennis v. Columbia Colleton Med. Ctr.*, 290 F.3d 639, 648 (4th Cir.2002).

As for retaliation claims, Title VII, the ADA and the ADEA all prohibit retaliation by employers against employees who have opposed (or sought relief for) unlawful employment practices. *See* 42 U.S.C. §§ 2000e–3; 42 U.S.C. §§ 12203; 29 U.S.C. §§ 623. In order to establish a prima facie case of retaliation, Young must show that: (1) she engaged in protected activity; (2) SHS took an adverse employment action against her; and (3) there is a causal connection (e.g., temporal proximity) between the protected activity and the adverse action. *Munday v. Waste Management of North America*, 126 F.3d 239,

242 (4th Cir.1997). Again, once a plaintiff establishes a prima facie case, the burden shifts to the defendant to provide a legitimate nonretaliatory reason for the adverse employment action. If the defendant meets its burden, the plaintiff then must satisfy the ultimate burden to show by a preponderance of the evidence that defendant's proffered reason was pretextual. *Id.; Von Gunten v. Maryland*, 243 F.3d 858, 863 (4th Cir.2001).

 Despite defendant's contentions to the contrary, Young has marshaled sufficient evidence to satisfy the requirements of a prima facie case of disparate treatment on the basis of age, as well as a prima facie case of retaliation. Young clearly suffered an adverse employment action when she was *suspended indefinitely* and told that whether she would retain her job hinged on the outcome of the review of her slides.* Although minor or

---

* Young's principal claim in this case is that her suspension ripened into a constructive discharge. I disagree; the constructive discharge claim plainly fails. Constructive discharge occurs "when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job." *Holsey v. Armour & Co.*, 743 F.2d 199, 209 (4th Cir.1984), *cert. denied*, 470 U.S. 1028, 105 S.Ct. 1395, 84 L.Ed.2d 784 (1985).

To establish a claim of constructive discharge a plaintiff must prove (1) deliberateness of the employer's action, and (2) intolerability of working conditions. *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir.1985), *cert. denied*, 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986). Although the plaintiff must prove the employer's specific intent to force her to leave, intent can be inferred from circumstantial evidence. *See Pollard v. High's of Balt., Inc.*, 281 F.3d 462, 472 (4th Cir.2002).

"Deliberateness exists only if the actions complained of were intended by the employer as an effort to force the plaintiff to quit." *Taylor v. Virginia Union Univ.*, 193 F.3d 219, 237 (4th Cir.1999) (*en banc*), *cert. denied*, 528 U.S. 1189, 120 S.Ct. 1243, 146 L.Ed.2d 101 (2000). The deliberateness of an employer's

action may be proven by actual or circumstantial evidence. *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir.1994). The "intolerability" of work conditions is evaluated in terms of whether a reasonable person would find them so and thus be forced to resign. *Bristow*, 770 F.2d at 1255.

Even assuming that Young projects sufficient evidence of deliberateness in this case based on the evidence of Taylor's antipathy for her, she nevertheless fails to show that the circumstances surrounding the imposition of the indefinite suspension without pay created the level of intolerability Fourth Circuit precedents require. Young's constructive discharge theory basically is as follows: she thought that if she remained on the job she would be fired, and rather than waiting to learn the results of the review of her work and then, if necessary, resisting any effort to terminate her employment, and in order to avoid having to admit to future prospective employers that she had been terminated if she were unsuccessful, she resigned. But "[t]he doctrine of constructive discharge protects an employee from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his co-workers. The employee

trivial actions that make an employee unhappy do not constitute materially adverse employment actions, a formal disciplinary suspension is obviously much more than that. *Russell v. Bd. of Trs.*, 243 F.3d 336, 341 (7th Cir.2001); *Biolchini v. General Elec. Co.*, 167 F.3d 1151, 1154 (7th Cir. 1999) (undisputed that a one-week disciplinary suspension was a materially adverse employment action). SHS's contention that Young's premature resignation means she was never actually suspended is spurious.

 SHS also argues that Young has failed to show that any co-employee ever committed as egregious a breach of duty as did Young, i.e., false negatives on three high grade reviews in one week. There is some force to this contention. Nevertheless, one of the difficulties in this case for SHS is its failure to articulate precisely what its "legitimate" expectations were, and how it might "legitimately" (rather than on an *ad hoc* basis) respond to a cytotechnologist's failure to measure up to that expectation. Assuming the truth (as I must at this stage) of Young's contention that SHS "inflated" Young's responsibilities beyond that of every other cytotechnologist (by assigning her to perform *all* of the high grade reviews), Young can hardly be faulted for failing to identify a similarly situated coworker, i.e., one with Young's "inflated" responsibilities who had committed comparable errors. Furthermore, it is undisputed that the suspension followed within just a few weeks Young's

complaints to the Human Resources Department about Taylor's (arguably) age-based harassing behavior towards her. Establishing a prima facie is a "relatively easy test," *see Young v. Lehman,* 748 F.2d 194, 197 (4th Cir.1984), and is "not onerous." *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089 (The "burden of establishing a prima facie case of disparate treatment is not onerous.").

 Accordingly, I am persuaded that Young has made out a prima facie case of disparate treatment on the basis of age (but not on the basis of disability) and the burden of production thus shifts to SHS. SHS's legitimate, nondiscriminatory reason for suspending Young, that Young missed three high grade slides within a few days of work, requiring SHS to review Young's prior work ( some 500 slides), is apparent. Indeed, Young does not dispute the literal truth or accuracy of her deficient performance. Nevertheless, in the absence of any written or other clearly identified procedures for responding to such occurrences, Young does challenge the manner in which corrective action was decided upon and implemented and the very burdensomeness of the sanction imposed. That is to say, although Young seems to accept (as she must) that some sort of review of her work was essential under the circumstances, SHS's decision to impose an indefinite unpaid suspension during that review (coupled with an express threat of termination) was a highly

is not, however, guaranteed a working environment free of stress. Dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir.1994) (citations omitted). "[T]he law does not permit an employee's subjective perceptions to govern the claim of constructive discharge." *See Gray v. York Newspapers, Inc.,* 957 F.2d 1070, 1083

(3rd Cir.1992); *Clowes v. Allegheny Hosp.,* 991 F.2d 1159, 1161 (3rd Cir., 1993). Young's "wrong guess" about the outcome of the review of her work was simply that. While I certainly do not criticize Young for the manner in which she calibrated her options as she contemplated her suspension and the likely outcome of the review of her work, she plainly does not meet the high threshold of "intolerability" on the evidence in this record.

exaggerated response to an unexpected and, indeed, quixotic, drop in her work performance, which, because of the backup biopsies, posed only (or primarily) an "abstract" threat of actual harm.

Thus, the burden shifts back to Young to project sufficient evidence that SHS's proffered explanation was pretextual. *Reeves,* 530 U.S. at 148, 120 S.Ct. 2097. That is, to defeat SHS's motion for summary judgment, Young must project evidence from which a reasonable jury could reasonably infer by a preponderance of the evidence that the overall harshness of SHS's remedial action (an indefinite unpaid suspension coupled with an express threat of termination) was motivated by Taylor's (or Nevins's) animus based on Young's age, or by Taylor's (or Nevins's) retaliatory animus.

In my judgment, while the question is very close on this record, Young is entitled to present her age discrimination and related retaliation claims to a jury. It must be recalled that until August 2001, Young received excellent performance appraisals for her work. The Laboratory's statistics reflected that her work was well within the Laboratory average. Further, during the four years prior to its decision to suspend Young, SHS had never suspended any cytotechnologist for poor work performance or for misreading a slide. In response to Young's misreading of three high grade slides during one week, however, SHS demonstrated heightened concern about patient care and the potential for malpractice. Despite the facial reasonableness of SHS's response, I cannot predict how a jury will weigh and evaluate the myriad factors at play in this case in considering the *bona fides* of SHS's decision to impose an indefinite unpaid suspension (coupled with a threat of termination) on Young, including but not limited to: (1) SHS did not take into account the entirety of Young's work; (2)Young was reviewing all the high risk slides, which arguably increased her risk of false negatives in that category of work compared to other cytotechnologists; (3) Young's overall competency and performance had been excellent based on her monthly averages; (4) Young's perfect results on the Laboratory-wide proficiency test just days before, which had been submitted as the Laboratory's overall result; (5) the fact that, as the false negatives on the high risk slides were known by SHS to be intended to serve as corroboration to biopsy findings, the likelihood of actual harm to a patient was minimal; and (6) the history of arguably age-based animus (and the recent complaints of same) that had marked the soured relationship between Young and her direct supervisor, Taylor. I agree with SHS that taken singly, these factors lack substantial probative force. Nevertheless, the combination of facts and circumstances could reasonably support a jury finding that SHS's response was measurably disproportionate, and rose to the level of discrimination.

 I am cognizant that "when an employer gives a legitimate, nondiscriminatory reason for [disciplining] the Plaintiff, it is not [the] province [of the court or jury] to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for" the adverse action. *Hawkins v. PepsiCo,* 203 F.3d 274, 279 (4th Cir.2000) (*citing DeJarnette v. Corning, Inc.,* 133 F.3d 293, 299 (4th Cir. 1998)). Here, the history of age-based banter gives color to the "totality of circumstances" surrounding SHS's decision to impose a harsh remedial response to Young's very first serious performance deficiencies. In short, it cannot be said as a matter of law that SHS's decision to suspend Young indefinitely (coupled with an express threat of discharge) is not a shield

for age-based animus. Accordingly, the motion for summary judgment shall be granted in part and denied in part.

## IV.

For the reasons explained above, I shall grant in part and deny in part the motion for summary judgment.