**Barney WILSON, Plaintiff**

v.

**BOARD OF TRUSTEES OF THE COMMUNITY COLLEGE OF BALTIMORE COUNTY and Eugenia Proulx, Defendants**

No. CIV.AMD 04–1253.

United States District Court, D. Maryland.

Aug. 30, 2004.

Augustus T. Curtis, Law Offices of Augustus T. Curtis, Baltimore, MD, for Plaintiff.

Peter S. Saucier, Kollman and Saucier PA, Baltimore, MD, for Defendants.

## MEMORANDUM OPINION

DAVIS, District Judge.

Plaintiff, Barney Wilson, filed this action against defendants, the Board of Trustees of the Community College of Baltimore County and Eugenia Proulx, the President of the college, alleging, in three counts, the following claims: violation of his rights to speech and association under the First and Fourteenth Amendments to the federal constitution; violation of his right to due process under the Fourteenth Amendment to the federal constitution (each asserted pursuant to 42 U.S.C. § 1983), and breach of contract under state law. Defendants have filed a motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6), to which Wilson has filed an opposition. The parties' submissions have been carefully considered and no hearing is necessary. Local Rule 105.6 (D.Md.2004). For the reasons stated within, the motion shall be granted with prejudice as to Wilson's federal claims, but the state law claim shall be dismissed without prejudice for lack of jurisdiction.

### I.

■ The applicable standard for the review of a complaint challenged by a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6) is well settled:

A Rule 12(b)(6) motion should only be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir.1999). Furthermore, the "Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Rather, Rule 8(a)(2) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2).

*Migdal v. Rowe Price–Fleming Int'l, Inc.*, 248 F.3d 321, 325–26 (4th Cir.2001). It is also important to be mindful, however, that the defendants are entitled to have the

*legal sufficiency* of the complaint fully examined and that, although the truth of all facts is assumed, consistent with the complaint's allegations, *see Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), the court need not accept the legal conclusions drawn from the facts, *see Schatz v. Rosenberg,* 943 F.2d 485, 489 (4th Cir.1991), or unwarranted inferences, unreasonable conclusions, or arguments. *See generally* 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* §§ 1357 (2d ed. 1990 & 2004 Supp.).

## II.

Wilson is the former Campus Administrator of the Dundalk campus of the Community College of Baltimore County. As such, he was a highly-ranked member of the school administration, reporting directly to the President of the college, defendant Eugenia Proulx, who manages both the Dundalk and the Essex campuses. Wilson's employment with the college began in 1999 and ended in March 2004 under the following circumstances, as alleged in the complaint.

According to Wilson's allegations, made on "information and belief," "Proulx's tenure at the college has been marked by problematic relations with the college community, faculty, students and others." Proulx is perceived as arrogant and disrespectful of the concerns of others. A crisis in the relationship between the faculty and Proulx arose in April 2003 as a result of a dispute between Proulx and a faculty member at the Dundalk campus concerning confidentiality of student records. As a result, members of the faculty at the Dundalk campus "began to speak out against the failure of Proulx and others to govern properly the Dundalk campus." Specifically, the faculty began to discuss the possibility of forming a union. *See* Comp. ¶¶ 7–12. (There is no explicit allegation in the complaint that Wilson supported, or even spoke out about, faculty efforts to form a union.)

The complaint goes on to describe Wilson's role as he "publicly call[ed] on the administration to address faculty concerns at the Dundalk campus." Wilson "repeatedly approached Proulx and others in the administration asking that they address the dissatisfaction and anger among faculty members." Concomitantly, Wilson "met with faculty members . . . in an effort to repair the damaged relationships created by Proulx's actions." *Id.* ¶ 13. Indeed, Wilson "was one of the only administrators willing to speak openly about the faculty problems and the lack of morale," and "he repeatedly tried to convince Proulx and the other administrators of the urgency of the situation with the faculty." *Id.* ¶ 14.

As a result of his efforts, Proulx and others in the administration viewed Wilson as disloyal to the college leadership and "too supportive" of the faculty; Proulx orally stated as much to Wilson on more than one occasion. *Id.* ¶ 15. Moreover, Wilson spoke out publicly on several occasions, including during meetings with the local state legislative delegation, as to the need to establish a separate president position for the Dundalk campus. *Id.* ¶¶ 17, 18. Wilson's advocacy on this issue was directly contrary to the position of Proulx and the Board of Trustees of the college; if Wilson's view had prevailed, Proulx's authority would have been significantly diminished.

When Wilson stated his intention to attend a political fund-raiser for a member of the faculty who was a candidate for local political office, Proulx and her superior, the Chancellor, roundly criticized him for his intended attendance. Wilson attended

the fund-raiser, at which he did not discuss the issues surrounding the college. *Id.* ¶ 19.

Allegedly, "as a result of these and other episodes, Proulx began to pressure Dr. Wilson concerning his attitudes toward her, the Chancellor, and other administrators with whom he had disagreed on issues such as the union campaign and the Dundalk presidency," and Proulx "demanded to know" "who ... [Dr. Wilson was] loyal to." Dr. Wilson "replied that he was loyal to the college, the community that the college serves, and the mission of the community college." Proulx repeatedly demanded that Wilson "tow the line." *Id.* ¶ 20.

Matters between Wilson and Proulx came to a head on March 11, 2004, when Proulx demanded that Wilson reimburse the college for alleged personal phone calls made on a college-provided mobile phone. Wilson refused to accede to this demand unless and until Proulx provided him proof of the existence of a relevant policy. In the course of the confrontation, Wilson stated "that if Proulx refused to explain the school's policy or reconsider her demand, he would resign." *Id.* ¶ 21. Consistent with that threat, Wilson sent the following e-mail to Proulx a short time later:

March 11, 2004

Dear Dr. Proulx:

It is with great sadness that I am submitting my letter of resignation to the college. I want to thank you for the opportunity that you provided me to serve the CCBC Dundalk campus. I really enjoyed the experience and love both CCBC Dundalk and the community of Dundalk. If possible, I would like for March 31, 2004 to be my last day.

Respectfully submitted,

Barney

Defts.' Mot. to Dismiss, Exh. 1.*

Later, on the evening of March 11, 2004, during a telephone conversation between Wilson and the Chancellor, the Chancellor "indicated that [it] was not the college's intention" that Proulx terminate Wilson, and that he, the Chancellor, "would look into the issue [of reimbursement for mobile phone use]." *Id.* ¶ 24. Wilson told the Chancellor "that he would return to work the next day." *Id.* Despite Wilson's intention to rescind or withdraw his resignation (which Wilson alleges he did not "sign"), Proulx insisted upon his leaving and would not accept a withdrawal of his resignation. *Id.* ¶¶ 25, 26. Indeed, Wilson asserts that Proulx "explicitly terminated" his employment on March 12, 2004, when he attempted to return to work. *Id.*

Wilson never sought, and he was never provided, a grievance hearing or any other adjudicatory process by which to test the enforceability of his resignation or the appropriateness of his ostensible "termination" by Proulx.

* Defendants attached several documentary exhibits to their motion to dismiss. Although plaintiff does not dispute the authenticity of any of the exhibits and has not filed an affidavit pursuant to Fed.R.Civ.P. 56(f) seeking discovery, I have declined to consider any such document other than the paper copy of Wilson's e-mail resignation. The e-mail is plainly encompassed by the rule that in deciding a "[r]ule 12(b)(6) motion, a court may consider not only allegations of the complaint but also documents referred to in the complaint and relied upon by plaintiff in bringing the action. *Abadian v. Lee,* 117 F.Supp.2d 481, 485 (D.Md.2000); *Cortec Indus., Inc. v. Sum Holding, L.P.,* 949 F.2d 42, 47–48 (2d Cir.1991)." *Jordan v. Washington Mut. Bank,* 211 F.Supp.2d 670, 674 (D.Md.2002). Wilson admits he authored and electronically delivered to Proulx the letter of resignation, and he is "relying" on the ineffectiveness of his letter of resignation in pursuing this action. It was entirely appropriate for defendants to attach it to their motion as an exhibit.

## III.

Wilson alleges two federal claims. First, he contends that Proulx's "termination" of his employment was motivated in whole or in part by his exercise of his First Amendment right to speak out on issues of public concern, i.e., the turmoil at the Dundalk campus arising from Proulx's management style and demeanor, and the need to put in place a separate President at the Dundalk campus. (An additional First Amendment claim included in count one is based on the allegation that Proulx "terminated" his employment in retaliation for his attendance at the political fundraiser held on behalf of the faculty member candidate.) Second, he contends that he has been deprived of his government employment without due process in violation of the Fourteenth Amendment, i.e., without a pre-termination or post-termination hearing.

### A.

▉ I am constrained to conclude as a matter of law, consonant with defendants' assertions, that Wilson's resignation was effective upon its acceptance by Proulx. Accordingly, Wilson's claims fail as a matter of law at the threshold. Even assuming that a separate *signature* is needed for a resignation to be effective, Wilson's assertion that he did not "sign" the resignation is fatally undermined by his affixing to his e-mail letter of resignation the following: *"Respectfully submitted, Barney."*

Wilson's attempt "artfully" to "plead around" the legal reality of his resignation is unavailing. His account of his nighttime telephone conversation on March 11, 2004, with the Chancellor, *supra*, is insufficient as a matter of law to support the *legal conclusion* that his attempt to withdraw his resignation was effective, and that therefore his employment at the college ended because Proulx "terminated" him.

Indeed, although Wilson alleges that the Chancellor "indicated that [it] was not the college's intention" that Proulx terminate Wilson, Wilson had not then been "terminated" but, by his own admission in the complaint, had resigned. Moreover, *the very fact of this judicial action undercuts any suggestion that the Chancellor intended to, or did in fact, accept Wilson's withdrawal of his resignation.*

Nor has Wilson suggested anywhere in his complaint that his resignation was the product of coercion or duress. Although he asserts, in his memorandum in opposition to the motion to dismiss, that he intended to allege a "constructive discharge" claim, he has not done so. Even if he had made the requisite allegations, however, nothing in the narrative of the complaint remotely suggests the existence of a state of facts rising to the level of "intolerability of working conditions" required to sustain a claim of "constructive discharge" under federal law. *See generally Williams v. Giant Food, Inc.,* 370 F.3d 423, 434 (4th Cir.2004); *Young v. Shore Health System, Inc.,* 305 F.Supp.2d 551, 559 n. * (D.Md. 2003).

Accordingly, for the reason that the allegation that Wilson suffered a "termination" of his employment by defendants is flatly refuted on the very face of the complaint (as supplemented by defendants' exhibit (1)), Wilson's federal claims fail as a matter of law.

### B.

▉ Even if I were to consider the legal sufficiency of Wilson's federal claims, however, the result would be the same. Wilson's principal First Amendment claim is apparently based on a contention that Proulx retaliated against him (by "terminating" his employment) for his efforts to restore harmony to the Dundalk campus by publicly supporting (i.e., insisting upon)

greater efforts on the part of the administration to respond to concerns of the faculty, and by speaking out in favor of the establishment of a separate president for the Dundalk campus. The elements of such a claim are well known in this Circuit:

> To prevail [on a First Amendment claim under 42 U.S.C. § 1983], a public employee has the initial burden to prove that the allegedly protected speech (1) involved a matter of public concern and that his interest in commenting upon it outweighed the employer's interests in efficient operations, and (2) the speech constituted a "substantial" or "motivating factor" in the adverse employment decision. *Hughes v. Bedsole*, 48 F.3d 1376, 1385 (4th Cir.1995). Rather than attempting to define "public concern," the Fourth Circuit takes the approach of requiring that a plaintiff demonstrate that he was speaking as a citizen on matters of public concern, rather than as an employee on matters peculiar to his employment. *See DiMeglio v. Haines*, 45 F.3d 790, 805 (4th Cir.1995). Even if the employee is speaking as a private citizen, protection depends on a balance between his interest and governmental efficiency. *See id.*

*Childress v. City of Richmond*, 907 F.Supp. 934, 941 (E.D.Va.1995), *aff'd in relevant part*, 120 F.3d 476, 483 (4th Cir. 1997), *aff'd by equally divided court in relevant part in banc*, 134 F.3d 1205, 1207–08 (4th Cir.), *cert. denied*, 524 U.S. 927, 118 S.Ct. 2322, 141 L.Ed.2d 696 (1998).

The Fourth Circuit has explained that, "[i]t is not a constitutional matter when an employee 'speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest' .... In determining whether an employee's speech constitutes speech on a matter of public concern, we are guided by the content, form, and context of the speech in question." *Robinson v. Balog*, 160 F.3d 183, 187–88 (4th Cir.1998) (citation omitted). More recently, the Court has noted:

> A determination of whether a restriction imposed on a public employee's speech violates the First Amendment requires " 'a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' " This balancing begins with an inquiry into whether the speech at issue was that of *a private citizen speaking on a matter of public concern. See Mansoor v. Trank*, 319 F.3d 133, 137 (4th Cir.2003). If so, the court must next consider whether the employee's interest in his First Amendment expression outweighs the employer's interest in what it has determined to be the appropriate operation of the workplace.

*Kirby v. City of Elizabeth City*, 380 F.3d 777, 782 (4th Cir.2004)(some citations omitted; alterations in the original; emphasis added).

As a matter of law in the case at bar, accepting as true Wilson's factual allegations as set forth in the complaint but not the legal conclusions imbedded therein, Wilson was not *a private citizen speaking on a matter of public concern, id.,* in his efforts to change the professional atmosphere at the college. Rather, he was a high-ranking member of the college administration plainly at odds with his own leadership over matters of concern *to some of the constituencies of the college.* As defendants contend, because Wilson was a subordinate member of the college administration, he simply was not free to cut his own path (let alone a path *directly contrary* to that elected by the college leader-

ship) to the achievement of a resolution to the myriad disputes that gave rise to the alleged state of disharmony at the college. Manifestly, Wilson's superiors were entitled to insist on his support in respect to core issues of college governance and their methods of pursuing the college's educational mission.

In sum, as a matter of law, Wilson's activities, including the speech components thereof, were not taken in a "private citizen" capacity, nor were they addressed to a "matter of public concern" within the contemplation of *Kirby*. Moreover, Wilson's interest in being heard on such matters did not outweigh his superiors' interest "in what [they] determined to be the appropriate operation of the workplace." *Id.*

■  Similarly, the allegation of an infringement on Wilson's right of association fails to state a claim. As set forth above, Wilson in fact attended the political fund-raiser given on behalf of his faculty colleague. The conclusory assertion, i.e., "as a result of these and other episodes," that his attendance at the fund-raiser played a role in his "termination" is insufficient, even under the forgiving standards of Fed. R.Civ.P. 8(a), to state a claim of retaliatory motive violative of the First Amendment. *See id.,* at 783 n. 4.

■  Finally, as defendants contend, and as Wilson does not dispute, Wilson never sought a due process hearing to challenge his "termination." It is difficult to see how one can be unconstitutionally deprived of that which one never desired or sought in the first instance. The simple answer is there was no constitutionally cognizable "deprivation." Accordingly, Wilson's ostensible due process claim likewise fails as a matter of law.

## IV.

For the reasons set forth herein, the defendants' motion to dismiss shall be granted with prejudice as to the federal claims. In the absence of diversity of citizenship jurisdiction, I decline to exercise supplemental jurisdiction over plaintiff's state law claims. *See generally Andrews v. Anne Arundel County, Md.,* 931 F.Supp. 1255, 1267–68 (D.Md.1996), *aff'd,* 114 F.3d 1175, 1997 WL 321573 (4th Cir.)(table), *cert. denied,* 522 U.S. 1015, 118 S.Ct. 600, 139 L.Ed.2d 489 (1997). Accordingly, the state law claims shall be dismissed without prejudice. An order follows.