**Charles BARTLETT, Plaintiff,**

v.

**Eddie L. PEARSON, et al., Defendants.**

**No. 1:04CV1293TSE/TRJ.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Dec. 13, 2005.

---

## MEMORANDUM OPINION

ELLIS, District Judge.

Plaintiff, Charles Bartlett ("Bartlett"), a Virginia inmate proceeding *pro se*, filed this action pursuant to 42 U.S.C. § 1983. Bartlett, a non-smoker, alleges that defendants Eddie L. Pearson, Chief Warden at Sussex II State Prison ("Pearson"), V.B. Bullock, Lieutenant ("Bullock"), and C.B. Harris, Lieutenant ("Harris") violated his constitutional rights by housing him in the same cell and the same housing unit with smokers, thereby exacerbating his asthma and putting his long term health at risk. On July 1, 2005, defendants Pearson, Bullock, and Harris filed a Motion for Summary Judgment.[1] Pursuant to *Roseboro v.*

1. Although the initial complaint named as defendants Gene Johnson, Director of the Virginia Department of Corrections, Rufus Fleming, Regional Director and W. Rollins, Operations Officer of Sussex II State Prison, these defendants were dismissed pursuant to

*Garrison,* 528 F.2d 309 (4th Cir.1975), Bartlett was provided the opportunity to submit materials in response to the issues raised in defendants' Motion for Summary Judgment. On July 13, 2005, Bartlett filed a Memorandum of Law in Opposition to the Defendants' Motion for Summary Judgment, and the matter is now ripe for disposition on the current record. For the reasons that follow, the defendants' Motion for Summary Judgment must be granted.

## I.

On February 10, 2003, Bartlett arrived at Sussex II State Prison ("Sussex II") and signed a non-smoking contract, a requirement to be housed in a non-smoking housing cell.[2] His exposure to second-hand or environmental tobacco smoke ("ETS") apparently began on April 20, 2004, when, after having been in segregated housing for an unspecified period, he was released from segregation and placed in a housing unit for smokers. Bartlett informed the sergeant on duty that he had asthma and requested a non-smoking housing assignment. He was informed he could return to segregation or accept the housing in the pod housing smokers.[3] He apparently declined to return to segregation. On May 5, 2004, Bartlett's cellmate, a smoker, was replaced with another inmate, who was also a smoker. Bartlett repeatedly complained to defendant Bullock and explained that the ETS was creating health problems for him because of his asthma. Bullock advised Bartlett that he could return to segregation if he wanted a single cell without a cellmate. Bartlett apparently again declined this option.

On May 28, 2004, Bartlett was assigned a different cellmate, this one apparently a chain-smoker. This situation continued for approximately six weeks, into July 2004.[4] According to copies of Bartlett's grievances attached to his complaint, he was transferred to a non-smoking cell and non-smoking housing pod prior to July 16, 2004, and was informed by prison staff that he had been placed in non-smoking housing as soon as bedspace there had become available, apparently sometime in early to mid-July 2004. It is unclear from the complaint, but it appears that he there-

28 U.S.C. § 1915A on the ground that the complaint failed to state a claim against these defendants. *Bartlett v. Pearson,* Action No. 1:04cv1293 (Order E.D. Va. Jan. 12, 2005).

2. In support of his complaint, Bartlett submitted unnotarized affidavits of other inmates who have apparently signed contracts indicating that they are smokers, but have been housed in a non-smoking housing pod and vice-versa. According to Virginia Department of Corrections Operating Procedures in effect at Sussex II, inmates may designate themselves as smokers or non-smokers upon arrival and are thereafter classified accordingly. Pods within three of Sussex II's housing units are designated as smoking or non-smoking, and to the extent practicable and given considerations of safety and security, inmates are assigned to cells within smoking or non-smoking pods according to their self-designations as a smoker or non-smoker.

3. Special or segregated housing is not generally an alternative housing option, but rather primarily relates to disciplinary segregation and involves the loss of certain privileges. Although it may not have been a desirable alternative from Bartlett's perspective, he does not dispute that he was offered the option of remaining in segregation to avoid sharing a cell with a smoker.

4. Bartlett asserts that sharing a cell with smokers exacerbated his asthma, causing him to experience difficulty breathing, chest pain, and shortness of breath. In support of his complaint, Bartlett has submitted copies of grievances in which he expressed his concern that the exposure to ETS might trigger an asthma attack. Yet, Bartlett has not alleged, nor adduced any proof, that he experienced an asthma attack during any time he was housed in Sussex II.

after remained, for the most part, in a non-smoking cell until September 2004.[5]

On September 9, 2004, Bartlett, over his objections, was removed from a cell he shared with a non-smoker and placed in a cell with a smoker. Up to the time Bartlett filed his complaint on October 17, 2004, he continued to be housed with smokers. In response to his repeated grievances, the staff of Sussex II advised Bartlett that the facility included separate housing for smokers and non-smokers and that it was prison policy to house smokers and non-smokers separately when practicable to do so. The staff also made clear that smoking status was not the sole criterion for housing designations; other considerations, including safety and security of inmates and the facility were also important factors in making housing designations. Indeed, as the record reflects, these safety and security considerations take precedence over smoking preferences. According to defendant Pearson, these safety and security considerations require assessment of: "each prisoner's institutional behavior, the length of his sentence, the level of his aggressiveness (e.g. is he a sexual predator), his enemy situation and mental/physical characteristics." Pearson Aff. 1. Pearson also avers that because nearly all the prison beds are occupied and inmates frequently move in and out of special housing, cell assignments are complicated. *Id.* at 2. In sum, it is clear that the prison staff's primary concerns when making cell assignments are the safety and security of the inmates and the facility. Understandably, therefore, smoking preferences are often not immediately addressed and accommodated.

Bartlett filed his complaint on October 17, 2004. As relief, he seeks $407,000.00 in compensatory and punitive damages and a declaratory judgment that defendants have violated prison policies and Bartlett's constitutional rights. In their Motion for Summary Judgment, defendants correctly do not contest that Bartlett has properly exhausted his claim within the correctional institution. Accordingly, the merits of Bartlett's complaint are appropriately reviewed here.[6]

## II.

In reviewing a motion for summary judgment, courts must view the facts in the light most favorable to the party opposing the motion. *Porter v. United States Alumoweld Co.*, 125 F.3d 243, 245 (4th Cir.1997). In this regard, the courts must draw all reasonable inferences in favor of the nonmoving party, including questions of credibility. *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir.1994). Summary judgment is appropriate where "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). And significantly, no "genuine" issue of material fact is present unless "the evidence is such that a reasonable jury could ... return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Equally significant is that "[w]hen a motion for summary judgment is made and supported ... [by affidavits], an adverse party may not rest upon the mere

---

**5.** Although a grievance dated August 19, 2004, suggests Bartlett had been placed in a cell with a cellmate who smoked, he does not allege in his complaint that he was housed with smokers during the month of August.

**6.** *See* 42 U.S.C. § 1997e(a) (Prison Litigation Reform Act requirement that inmates exhaust all administrative remedies before filing an action challenging prison conditions under federal law).

allegations or denials of the adverse party's pleading." Fed.R.Civ.P. 56(e). Unsubstantiated, conclusory claims, without evidentiary support, are insufficient to satisfy a non-moving party's burden on summary judgment. *Carter v. Ball,* 33 F.3d 450, 461–62 (4th Cir.1994); *Goldberg v. B. Green & Co.,* 836 F.2d 845, 848 (4th Cir. 1988). Instead, a party seeking to avoid summary judgment must come forward and "set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e).

## III.

### A. *Declaratory Relief*

■ Bartlett's complaint alleges that defendants violated his Eighth Amendment rights by exposing him to ETS, which he claims resulted in the risk of future harm to his health and the actual harm of exacerbating his asthma and shortness of breath. Since filing his complaint, Bartlett has been transferred to another prison. Accordingly, his request for declaratory relief as to these defendants is moot, but his claim for damages remains and must be adjudicated. *See Williams v. Griffin,* 952 F.2d 820, 823 (4th Cir.1991) (holding that prisoner's transfer rendered claim for injunctive and declaratory relief moot but did not render his claim for damages moot).

### B. *Eighth Amendment Claim of Risk to Future Health*

■ Although it was not always so,[7] it is now well established that an inmate has a cause of action under the Eighth Amendment when prison officials, acting with deliberate indifference, expose him to levels of ETS that pose an unreasonable risk of serious damage to his future health. *Helling v. McKinney,* 509 U.S. 25, 35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). To prevail on a claim of risk of future injury, an inmate must show that the levels of ETS exposure are so substantial as to endanger his future health and that "society considers the risk ... so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Id.* at 36, 113 S.Ct. 2475 (emphasis in the original). An inmate must also show that prison officials were deliberately indifferent to the risk of harm to the plaintiff. *Id.*

■ Even assuming, *arguendo,* that Bartlett's exposure to ETS was so substantial as to result in a serious risk to his future health, he has not shown that defendants acted with deliberate indifference to that risk. Although defendants may arguably have been insufficiently sensitive to Bartlett's concern regarding his asthma or even careless in this regard, by no means can it be said that their behavior rose to the level of deliberate indifference. While the Fourth Circuit has not yet defined precisely what constitutes deliberate indifference to a prisoner's exposure to ETS, other circuits have done so, holding consistently that officials may be held to have acted with deliberate indifference where they ignore ETS risks, make no effort to address it, and instead require inmates to live and work in an environment filled with tobacco smoke or continuously house nonsmokers with smokers for extended periods of time despite knowledge of the inmate's sensitivity to smoke.[8] In this case,

---

**7.** *See West v. Wright,* 747 F.Supp. 329 (E.D.Va.1990) (holding that an inmate was required to show that exposure to ETS aggravated an existing medical condition in order to state an Eighth Amendment claim and citing authority to the same effect).

**8.** *See, e.g., Rochon v. City of Angola, La.,* 122 F.3d 319, 320 (5th Cir.1997) (forcing a pris-

however, defendants were not indifferent to Bartlett's health concerns. To the contrary, they attempted to accommodate Bartlett's requests for non-smoking housing. First, defendants apparently twice offered Bartlett the option to "check in" to special or segregated housing if he wanted a single cell without a cellmate.[9] Defendants also note that Bartlett had the option of requesting assignment to medical unit housing, which is available in extreme situations. Pearson Aff. 4. There is no evidence that Bartlett did so in this case. Moreover, in response to Bartlett's numerous grievances, defendants and other prison staff repeatedly informed Bartlett that he would be moved into non-smoking housing as soon as possible, but that the primary concerns of inmate and facility safety and security prevented moving him immediately. In the end, Bartlett's request for non-smoking housing was accommodated from mid-July to September 9, 2004. Thus, it appears from the record that Bartlett was housed with smokers for no more than approximately seventeen weeks of the time period covered by his complaint. Shortly thereafter he was transferred to another facility.

In determining whether officials acted with deliberate indifference, it is appropri-ate to consider the realities of prison administration. See Helling, 509 U.S. at 37, 113 S.Ct. 2475 (finding that in evaluating whether prison officials were deliberately indifferent, courts should consider the realities of prison administration). One of these realities is prison overcrowding; as defendants' state, and Bartlett does not dispute, "almost every bed [at Sussex II] is occupied" and smoking preferences are secondary to safety and security issues. The record reflects that defendants had legitimate safety and security concerns that prevented them from immediately accommodating Bartlett's requests for non-smoking housing, and thus they cannot be said to have been deliberately indifferent in not immediately complying with his housing requests. See Simmons v. Sager, 964 F.Supp. 210, 213 (W.D.Va.1997) (finding that security concerns were a legitimate reason not to take certain actions to reduce ETS such as opening doors and using fans).

This conclusion finds firm support in a comparison of this case with those cases that have reached a contrary conclusion. In general, courts find that prison officials act with deliberate indifference in this context when they have failed to adopt a facility policy or regulations aimed at limiting inmates' exposure to ETS.[10] This is not

---

oner to live and work in an environment permeated with tobacco smoke amounts to deliberate indifference); Atkinson v. Taylor, 316 F.3d 257, 269 (3d Cir.2003) (officials who housed an inmate with "constant" smokers for over seven months despite being informed that the inmate's sensitivity to smoke resulted in nausea, an inability to eat, headaches, chest pains, difficulty breathing, numbness in his limbs, and other physical problems, were deliberately indifferent).

9. To be sure, the option to choose segregated housing may not have been an especially appealing alternative, but the offer was not unreasonable in the circumstances and the fact that it was offered helps negate any inference of deliberate indifference.

10. See, e.g., Talal v. White, 403 F.3d 423, 427 (6th Cir.2005) (officers who smoked and allowed prisoners to smoke in designated non-smoking units in disregard of the rules were deliberately indifferent); Alvarado v. Litscher, 267 F.3d 648 (7th Cir.2001) (an Eighth Amendment claim arises when officials deliberately fail to enforce rules regulating smoking); Warren v. Keane, 196 F.3d 330 (2d Cir. 1999) (under-enforcement of inadequate smoking rules, overcrowding, and poor ventilation resulting in a prison environment permeated with smoke amounts to a violation of the Eighth Amendment).

such a case; such a policy was in effect at Sussex II. Of course, the mere existence of such a policy will not, by itself, satisfy the requirements of the Eighth Amendment; there must be a good faith effort to enforce the policy and the absence of such an effort may result in a finding of deliberate indifference.[11] Again, this is not such a case; the record here discloses no bad faith by defendants in implementing the policy at Sussex II.

More specifically, officials at Sussex II created and implemented a policy to limit non-smoking inmates' exposure to ETS in the housing pods. And, unlike the prison in the *Warren* case, where smoking in cells and recreation areas was unrestricted, *see Warren*, 196 F.3d at 331, defendants here attempted to enforce the policy, by designating three housing pods and numerous other areas within the prison as non-smoking. Pearson Aff. 4. Moreover, it appears that to the extent feasible,. given paramount safety and security considerations, defendants here attempted to assign inmates to share cells with inmates with the same smoking preferences. *Id.* It is also noteworthy that the Sussex II facility policy also prohibited employees from smoking inside any building. *Id.* In sum, although accommodation of non-smoking preferences is subject to inmate and facility safety and security concerns, non-smoking preferences are one of the criteria for cell assignments when inmates are in general population housing. Pearson Aff. 2. Unlike the facts of the *Talal* and *Alvarado* cases, in which smoking regulations were not enforced, Bartlett concedes, as he must, that Sussex II had a housing policy addressing ETS and he neither alleges nor shows that defendants made no attempt, or only a bad faith attempt, to enforce the facility smoking regulations.

To be sure, Bartlett does claim, and defendants do not dispute, that inmates sometimes managed to acquire tobacco products and smoked in the non-smoking housing pods despite the regulations. Yet, in contrast to the facts of *Talal* and *Alvarado*, Bartlett concedes that no tobacco products were sold in the non-smoking housing units.[12] Nor does the record support any inference of bad faith by prison officials in enforcing the smoking policy. Thus, although prison officials may not have been entirely successful in their efforts to enforce the facility smoking restrictions, they cannot be said to have been deliberately indifferent for that reason alone. Similarly, although Bartlett asserts that prison staff managed housing assignments for smokers and non-smokers ineffectively, this assertion, even if true, does not amount to deliberate indifference; he does not deny defendants' assertion that Sussex II is crowded and space in the prison is limited, nor does he deny that the

---

**11.** *See Talal*, 403 F.3d at 427–428. (Eighth Amendment claim found based on total failure of prison guards to enforce the prison's no smoking policy by punishing violators or acting on grievances relating to ETS and themselves smoking in non-smoking units in violation of the policy); *see also Alvarado*, 267 F.3d at 650 (guards' complete failure to enforce the smoking ban raised an Eighth Amendment claim). Importantly, however, the Eight Amendment does not require flawless enforcement or reach negligent enforcement; the failure to enforce must be so substantial as to reflect prison officials' deliberate indifference as to the policy's efficacy. *Cf.*

*Scott v. Dist. of Columbia*, 139 F.3d 940, 944 (D.C.Cir.1998) (imperfect enforcement of a no-smoking policy does not rise to the level of deliberate indifference when prison officials make good faith effort to enforce the policy).

**12.** In addition to stating that tobacco products are not sold in the non-smoking pods, Bartlett's October 11, 2004, letter to Rollins, attached to his Memorandum of Law in Opposition to the Defendants['] Motion for Summary Judgment, also notes that prison staff must go outdoors to smoke.

smoking preferences of inmates are sometimes accommodated.[13]

Bartlett arrived at Sussex II on February 10, 2003, but during the period from April 20, 2004 to approximately October 23, 2004, he was required to share a cell with smokers for a total of only approximately seventeen weeks. During that time, defendants provided Bartlett with non-smoking housing in the regular housing units when space was available and safety and security conditions permitted. In addition, defendants offered Bartlett the option of non-smoking housing in segregation. Finally, defendants had a policy in place to limit inmate exposure to ETS and attempted in good faith to enforce it. In the circumstances, therefore, defendants did not act with deliberate indifference to the risk ETS posed to Bartlett.

### C. Bartlett's Claim of Serious Medical Need

▮ To sustain a claim that defendants were deliberately indifferent to Bartlett's current health problems, Bartlett must show that he had a medical need that was sufficiently serious to require medical treatment and that defendants were aware of that serious need, but acted with deliberate indifference. See Farmer v. Brennan, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); Brice v. Va. Beach Corr. Ctr., 58 F.3d 101, 104 (4th Cir.1995). A plaintiff states a serious medical need where exposure to ETS results in health problems so severe they require medical treatment. See Johnson v. Pearson, 316 F.Supp.2d 307, 319 (E.D.Va.2004) (holding that an inmate who experienced respiratory problems, headaches, eye irritation,

runny nose, dizziness and occasional stomach cramping but was denied access to medical treatment despite defendants' knowledge of inmate's health problems stated an Eighth Amendment claim). And, it is clear that a prison official is deliberately indifferent where he knows of an inmate's serious medical need, but denies treatment. See McIntyre v. Robinson, 126 F.Supp.2d 394, 401 (D.Md.2000) (plaintiffs with specific medical conditions caused or exacerbated by ETS stated a claim where prison officials failed to enforce smoking policies and failed to act in response to medical orders to reduce plaintiffs' exposure to ETS).

Here, Bartlett alleges that as a result of exposure to ETS he experienced exacerbated asthma symptoms, particularly shortness of breath, which required increased use of his inhaler. But importantly, he does not allege that his symptoms required specific medical treatment that he did not receive. In this connection, he submitted copies of two medical requests in response to which medical staff confirmed that Bartlett suffered from asthma. In one response medical staff suggested that Bartlett continue to request housing in which he would not be exposed to ETS. The medical staff also advised Bartlett to contact them if he had any more severe problems from his asthma. Neither party in this action has alleged or provided any evidence that Bartlett experienced problems from his asthma that required additional medical treatment beyond the medication he was already taking. Therefore, it does not appear that Bartlett suffered a serious medical need.

13. See Boblett v. Angelone, 942 F.Supp. 251, 253 (W.D.Va.1996) (officials who attempted to enforce non-smoking dormitory rules were not deliberately indifferent even though enforcement was not as rigid as plaintiff would

have liked); see also Scott, 139 F.3d at 944 (officials are not deliberately indifferent when they make a good faith effort to enforce no smoking rules).

Even assuming, however, that Bartlett had a serious medical need, he does not allege that defendants were aware of that need and denied him access to medical care or treatment. An inmate states a valid ETS claim only when the inmate experiences severe physical symptoms, but is denied access to medical care. *See Johnson*, 316 F.Supp.2d at 310, 311. In the instant case, Bartlett does not allege, and the record does not indicate, that he was denied access to medical care, either in response to a serious medical need or at any other time. Specifically, in a grievance dated May 19, 2004, Bartlett, in an effort to obtain documentation to support his request for non-smoking housing, requested that the medical staff acknowledge he had asthma, and medical staff complied. In another grievance dated August 19, 2004, Bartlett requested that he be housed with non-smokers because he was concerned that he might experience an asthma attack, but again did not allege any specific health problems at that time. Significantly, the prison staff responded that Bartlett should let them know if he experienced problems with his asthma that required treatment. Nothing in the records shows that this occurred. In sum, the record reflects that Bartlett had ample access to medical staff and that neither they, nor defendants, were deliberately indifferent to his health concerns. Therefore, Bartlett's Eighth Amendment claim must be dismissed.

Although this is not a case of deliberate indifference by prison officials, it is nonetheless worth emphasizing here that there is no longer any doubt that prison officials may not ignore the fact that ETS can pose a serious risk of harm to inmates in prison facilities,. especially to inmates like Bartlett who suffer from asthma. To the contrary, it is now settled that prison officials must address the problem by adopting, as occurred here, appropriate policies and regulations. But merely adopting such policies and regulations is, by itself, not enough; prison officials must also make a good faith effort to implement and enforce them, as also occurred here. In doing so, however, it is appropriate for prison officials to count as paramount the need to ensure inmate and facility safety and security. It is also important to note that the question is not whether the policy and regulations adopted are the best that might be fashioned or that implementation has been flawless or non-negligent. The Eighth Amendment does not require prison officials' non-negligent performance; it does command, however, that prison officials not be deliberately indifferent in this regard—in other words, that they not act in bad faith. A contrary rule would lead to the inappropriate result of requiring federal courts to micro-manage the operation of prison facilities.[14] Thus, before an inmate Eighth Amendment ETS claim can proceed, the record must disclose, at a minimum, that claimant can prove by a preponderance of the evidence that prison officials acted with deliberate indifference in either failing to fashion a policy addressing inmate exposure to ETS, or in failing to make a good faith effort to implement or enforce the policy.[15] This rec-

---

**14.** It must be noted in this regard that the Eighth Amendment does not prevent prison officials from banning smoking altogether from prison facilities; no prisoner has the constitutional right to smoke. If prison officials allow smoking, however, then they must take steps to adopt and implement a policy that ensures that non-smoking inmates are not exposed to unreasonable risk of serious health effects from ETS exposure to the extent permitted by inmate and facility safety and security.

**15.** Of course, as *Helling* teaches, a claimant must also satisfy the objective factor, namely whether the risk complained of by claimant is

ord, as a matter of law, precludes such a finding.

## IV.

For the reasons stated above, Bartlett's claim must be dismissed and defendants' Motion for Summary Judgment must be granted. An appropriate Order shall issue.

"so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling,* 509 U.S. at 36, 113 S.Ct. 2475.